IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL A. LEISGANG,

        Plaintiff,

        v.

KILOLO KIJAKAZI, Acting Commissioner
of Social Security, [1]

        Defendant.

OPINION AND ORDER

21-cv-40-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Michael A. Leisgang is appealing a decision of the Acting Commissioner of Social Security denying his application for disability insurance benefits and supplemental security income under the Social Security Act.  He asks this court to reverse the acting commissioner's decision and remand his case for further proceedings on the ground that the administrative law judge (ALJ) who denied his claim committed the following errors:  (1) failed to adopt all the limitations endorsed by a medical consultant whose opinion the ALJ found persuasive; (2) failed to cite good reasons for rejecting the opinion of plaintiff's treating psychiatrist; and (3) failed to ensure that the job numbers offered by the vocational expert were reliable.

In addition, plaintiff contends that the ALJ was not constitutionally authorized to

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021, replacing the former comissioner, Andrew Saul.

1

render her decision in light of the Supreme Court's decision in <u>Selia Law LLC v. Consumer Fin. Prot. Bureau</u>, 140 S. Ct. 2183 (2020).   I considered and rejected this same constitutional challenge in <u>Kreibich v. Kijakazi</u>, 20-cv-1045-bbc, 2/23/22 Op. and Ord., dkt. #25, 16-18, and I reject it for the same reasons here, without further discussion.   Plaintiff's remaining challenges to the ALJ's decision are not persuasive, for reasons set forth below. Accordingly, I will affirm the acting commissioner's decision.

The following facts are drawn from the Administrative Record (AR).

## FACTS

### A.   <u>Medical Evidence</u>

Plaintiff enlisted in the Army in 2008 after graduating from high school.   He was medically discharged about a year later after a lower back injury, which in turn triggered anxiety and depression.   He has a service-connected disability and a finding of unemployability from the Veterans Administration.   Plaintiff has received treatment at the VA Medical Center in Tomah, Wisconsin, whose physicians have diagnosed him variously with depression, borderline personality disorder, bipolar disorder, post-traumatic stress disorder (PTSD), generalized anxiety disorder, antisocial traits, dissociative disorder, and nightmare disorder.   AR 1753.   Between August 2010 and August 2014, he was hospitalized at least seven times for increased depression with suicidal thoughts.   AR 22.   Plaintiff has attributed his mental conditions to a history of childhood abuse and trauma while living with his mother and maternal grandparents.   AR 3007.

2

After his last hospital discharge in August 2014, plaintiff continued to receive psychiatry and counseling services from the VA on an outpatient basis. At a mental health interview with psychologist Sarah Dahl, Ph.D., in December 2015, plaintiff reported that his mood was stable on his medications. He had some anxiety, including occasional panic attacks when under stress, in large crowds, or when his mind was "idle" and he began thinking about his past trauma. AR 3005-06. Plaintiff said that his medications and therapy had been very helpful in reducing his suicidal thoughts and helping him to be more forward looking instead of dwelling in the past. AR 3007.

Plaintiff continued to participate in individual and group therapy and manage his psychiatric medications through the VA up until the date of his hearing before the ALJ. In July 2019, he asked the VA to transfer his care to a new psychiatrist and therapist, voicing dissatisfaction with his current providers' treatment approach. AR 1845, 1852. His psychiatric care was transferred to Dr. Wendy Yim and Kenneth Proust took over as his therapist.

At her initial interview with plaintiff in July 2019, Dr. Yim noted that plaintiff reported having depressed mood, stress, and brief episodes of elation on a more frequent basis since November 2018, when he had a falling out with his father. In addition, in the past year, he had come out as gay to his parents and grandparents, successfully lost 30 pounds, and stopped taking all of his medications but one. AR 1846-51. On mental status exam, Dr. Yim observed that plaintiff was neatly shaved, made direct eye contact, spoke with normal rate and volume, and displayed collaborative behavior. She noted that his thought

3

process was linear and goal directed, and he denied suicidal ideation. He described his mood as "okay" and Dr. Yim noted his affect to be euthymic with full range. She described his insight and judgment as fair. AR 1843. Dr. Yim's diagnosis was mood disorder, unspecified, with "atypical/very brief hypomanic like episodes." Id. She added Abilify to the one medication he was taking and advised him to continue psychotherapy with his new therapist.

At a follow up appointment a month later, plaintiff told Dr. Yim that the addition of Abilify to his medication regime had "greatly stabilized" his moods and improved his ability to enjoy life. AR 1837-38. He still had some irritability but it was improved, he had started a new relationship, and he had been attending a LGBTQ community center where he obtained support. Dr. Yim described plaintiff as "amicable," with an even mood, spontaneous speech, and good insight and judgment. AR 1840-41.

Plaintiff continued to see Dr. Yim about once a month. In March 2020, she adjusted his medications after plaintiff reported a flare of his depression and some episodes of restless legs. AR 2473. After the medication adjustment, plaintiff reported that his mood was better. AR 2466. Around that time, plaintiff's visits with Dr. Yim switched to video visits in response to the coronavirus pandemic. Dr. Yim's recorded observations of plaintiff during her mental status evaluations at each visit repeatedly described him as appearing normal in appearance, speech, thought content, thought process, and mood, with fair to good judgment and insight. See, e.g., AR 2459, 2461, 2464, 2466. Proust, the therapist, made similar observations. See, e.g., AR 1826, 1834, 1838, 2484.

In May 2020, Dr. Yim met by video with plaintiff to review the questions on a

4

Mental Work Capacity Questionnaire that she had received from plaintiff's attorney in connection with his pending application for social security benefits. AR 2453-54, AR 2224-27. On the form, Dr. Yim indicated that plaintiff had an unspecified mood disorder that manifested itself in significant mood swings with frequent depression, anxiety, irritability and agitation. AR 2224. She noted that plaintiff had very low stress tolerance, as well as difficulty with interpersonal relationships. Id. She wrote that he was not capable of even "low stress" jobs because of his low frustration level and his tendency to quickly become agitated, noting that he had been unable to sustain jobs after his military service years ago despite efforts. AR 2225. She found plaintiff moderately restricted in activities of daily living and in maintaining social functioning and markedly restricted in maintaining concentration, persistence, or pace, and she noted that he had had no episodes of decompensation within a 12 month period. AR 2226. As for work limitations, she found that plaintiff was significantly limited in numerous mental abilities necessary to perform work, noting that he had had these limitations since about January 2010.

In July 2020, Dr. Yim noted that plaintiff's anxiety and mood were "well controlled" and he was doing well. AR 2436.


B. Administrative Proceedings

On August 6, 2019, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging that he had been disabled since November 2010, when he was 21 years old, and he had the severe impairments of depressive disorder, anxiety

disorder, and personality disorder.  Plaintiff also applied for supplemental security income under Title XVI.

Susan Donahoo, Psy. D., a consultant for the local disability agency, reviewed plaintiff's application and medical records in September 2019.  Donahoo found that plaintiff had moderate "paragraph B" criteria limitations, except that he had no limitations in the area of understanding, remembering or applying information.  AR 71. Assessing plaintiff's mental residual functional capacity (RFC), Donahoo found that he would be

> expected to have some difficulty following a schedule, working without being distracted by others and handling a normal workweek without symptoms.  He does have the capacity to carry out simple to complex instructions in a routine work setting on a regular basis.

AR 74. Although Donahoo anticipated plaintiff would have "some difficulty interacting with others in the workplace," she found that he nonetheless showed "the capacity to respond appropriately to others in a routine work setting."  Id.  Finally, Donahoo stated that plaintiff would be "expected to have some difficulty adapting to changes and stressors in the workplace," but she added that he showed the capacity to respond appropriately to changes in a routine work setting.  AR 73-74.

The agency denied plaintiff's application, finding him not disabled.   On reconsideration, a second medical consultant, Robert Barthell, Psy. D, found that plaintiff had no limitation in understanding, remembering, or applying information, moderate limitation in interacting with others, and in concentrating, persisting or maintaining pace, and mild limitation in adapting or managing oneself. AR 89.  In Barthell's view, plaintiff was able to carry out 2-3 step instructions, sustain attention for up to two hours at a time, and

6

interact occasionally with supervisors, but would "do better in jobs that do not require frequent interaction with the general public."  AR 93.  Plaintiff's applications were denied on reconsideration on March 25, 2020.

Plaintiff was granted a hearing before an ALJ on August 25, 2020, which was held by telephone because of the pandemic, and at which he was represented by counsel.  Stewart Gilkerson testified as a vocational expert.

At the hearing, plaintiff testified that he had worked as a cook in the Army for about a year before being discharged because of his mental symptoms.  After his discharge, he said, he had worked briefly as a cook at a country club, but had made so many mistakes and had so many angry outbursts that he had been terminated.  AR 51-52.  He said it had been almost six years since he was last hospitalized for mental problems , and that his medications were doing a "pretty good job" at keeping him in balance.  AR 46.

Plaintiff testified that he could not work because of anxiety and depression, as well as lower back and inner chest wall pain. AR 44.  He said his anxiety and depression were brought on by any kind of stress.  AR 46.  When he had an anxiety attack, he would try to stop it by doing something soothing, such as listening to music, and if that didn't work, he would resort to a muscle relaxer.  AR 53-54.  Plaintiff said his anxiety would bring on racing thoughts that prevented him from concentrating on anything else, including his household chores.  AR 54.  He was independent in self care, could drive,  go to the grocery and do light household chores, and he shared an apartment with his partner.  His daily activities consisted of having breakfast, showering, getting dressed, reading a book or going for a walk

with his partner, playing video games, or doing whatever else he could to make sure that he was "in a low stress environment and relaxed and calm." AR 49. Plaintiff testified that he has continued to have the kinds of outbursts that led to his firing from the country club. AR 52.

The ALJ posed a hypothetical to Gilkerson, the vocational expert, in which she asked him to assume a person of plaintiff's age, education, and past work, and who was limited to work that was

> simple, routine and repetitive but not at a production rate pace. For instance, no assembly line work. The individual would be able to tolerate occasional interaction with supervisors, coworkers and the public and they would be able to tolerate few changes in a routine work setting.

AR 58. In Gilkerson's opinion, plaintiff would be unable to perform any of his past work, AR 58, but would be able to perform work as a kitchen helper, sweeper/cleaner, or hospital cleaner, and he provided a corresponding number from the Dictionary of Occupational Titles for each job. Id. Gilkerson provided national job number estimates for each job, testifying that there were 309,000 kitchen helper jobs, 1,300,000 sweeper/cleaner jobs and 430,000 hospital cleaner jobs. AR 58. He said none of these jobs required contact with the public. AR 59.

Asked by plaintiff's counsel about the source of his job numbers, Gilkerson testified that he used the information provided him by the Occupational Employment Quarterly (OEQ). AR 61. According to Gilkerson, the OEQ uses the "equal distribution method" of estimating job numbers based upon the number of Dictionary of Occupational Titles codes contained within a particular job category. Id. When asked by plaintiff's counsel whether

he thought this was a reliable method of estimating national job numbers, Gilkerson responded that it was "the only method" available to him.  Id.

In response to questions from the ALJ, Gilkerson testified that an employee needing a 30 minute unscheduled break once every two weeks or subject to an outburst of anger three or more times a week would not be able to perform the jobs that plaintiff had held in the past, because employers would not tolerate it.  AR 59.  This would be true as well for a person who would be absent from work two days a month or off task 15 percent of the day because of psychological impairments.  AR 60.

C. The ALJ's Decision

On October 22, 2020, the ALJ issued a decision in which she concluded that plaintiff was not disabled under the five-step inquiry for evaluating claims such as his.  20 C.F.R. §§ 404.1520, 416.920.  At step one, she found that plaintiff met the insured status requirement of the Social Security Act through June 30, 2012 and had not been engaged in substantial gainful activity since November 15, 2010, the alleged onset date.  AR 17.  At step two, she found that plaintiff had the severe impairments of depressive disorder, anxiety disorder, and personality disorder.  Id.  (She noted that plaintiff also received treatment for a lumbar strain and asthma, but she found neither of these impairments resulted in any significant work limitations.  Plaintiff does not challenge this finding.)  At step three, the ALJ found that plaintiff's impairments were not severe enough to meet or medically equal the criteria of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P., App. 1.  AR 18-19.

The ALJ determined that plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but that he had the following non-exertional limitations: he was limited to work that was simple, routine, and repetitive, and did not require a production rate pace (such as assembly line work); he could tolerate occasional interaction with supervisors, co-workers, and the public; and he could tolerate few changes in a routine work setting. AR 20. In reaching this conclusion, the ALJ considered the medical opinions from the state agency consultants, Donahoo and Barthell, and Dr. Yim. The ALJ found Dr. Yim's restrictive May 2020 opinion unpersuasive, finding it inconsistent with her own treatment records, which revealed "generally unremarkable objective findings on mental status examination," AR 26, and also inconsistent with plaintiff's hearing testimony, in which he indicated that his symptoms were "generally controlled with regular use of his psychotropic medications." Id.

The ALJ was more persuaded by the September 2019 administrative findings of Susan Donahoo. While acknowledging that Donahoo made some findings that were "somewhat vague," the ALJ concluded that Donahoo had concluded that plaintiff could perform simple work in a routine work setting, with some difficulty working with others. The ALJ found this conclusion to be consistent with the medical evidence, which showed that although plaintiff had a long history of mental health treatment with several hospitalizations prior to 2014, he had a gap in mental health treatment from 2014 to 2018 and improvement in his symptoms with more recent outpatient treatment. In addition, the ALJ found Donahoo's assessment consistent with plaintiff's hearing testimony, which indicated that his symptoms

were generally well-controlled with medication.  AR 25.  As for Barthell, the other agency psychiatric consultant, the ALJ found his opinions "partially persuasive," noting that she disagreed with Barthell's conclusion that plaintiff had only mild limitation in adapting or managing himself.  AR 25.  In the ALJ's view, this conclusion was not consistent with the notes of "labile mood" that were documented throughout plaintiff's therapy records. AR 26.

Overall, the ALJ found plaintiff's statements about the intensity, persistence, and limiting effects of his mental symptoms to be inconsistent with his longitudinal treatment records from the VA.  The ALJ noted that plaintiff's last hospitalization was in 2014 and that since that time, his symptoms had generally been controlled with medication. When there were exacerbations, they were not long-term and were often related to financial or social stressors, particularly plaintiff's problems dealing with his mother.  AR 21.

Relying on Gilkerson's testimony, the ALJ found at step four that plaintiff did not have the residual functional capacity to perform the requirements of his past relevant work, as a Cook (classified as medium), or as an Order Clerk (sedentary), either as he had actually performed it or as it has generally been performed in the national economy within the last 15 years.  AR 26-27.  At step five, however, the ALJ again relied on Gilkerson's testimony and found that plaintiff's age, education, work experience, and residual functional capacity supported a finding that jobs existed in significant numbers in the national economy that he could perform.  AR 27.  Accordingly, the ALJ found that plaintiff had not been under a disability, as defined in the Social Security Act, at any time from November 15, 2010 through the date of the decision.

The Appeals Council subsequently denied plaintiff's request for review, making the ALJ's decision the final decision of the commissioner for purposes of judicial review.

OPINION

The task for a court reviewing a decision by an ALJ is to determine whether the decision is supported "by sufficient evidence to support the agency's factual determination," Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). The threshold for sufficiency is not a high one; it requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The ALJ must identify the relevant evidence and build a "logical bridge" between the evidence and the ultimate determination. Moon v. Berryhill, 763 F.3d 718, 721 (7th Cir. 2014).

As noted above, plaintiff contends that the ALJ committed the following errors: (1) failed to adopt all the limitations endorsed by Donahoo; (2) failed to cite good reasons for rejecting the findings on the May 2020 questionnaire completed by Dr. Yim; and (3) failed to ensure that the job numbers offered by the vocational expert were reliable.

A. Donahoo's Opinion

Plaintiff does not argue that the ALJ erred in finding Donahoo's opinion persuasive. Instead, he argues that the ALJ "cherry picked" Donahoo's report, failing to mention certain findings that suggested more severe limitations. Specifically, plaintiff argues that the ALJ failed to credit the following "key findings" from Donahoo's report:

"Claimant expected to have some difficulty following a schedule, working without being distracted by others and handling a normal workweek without symptoms;" and

"Claimant expected to have some difficulty adapting to changes and stressors in the workplace."

AR 74.  Plaintiff argues that, because these limitations likely would affect his ability to perform unskilled work, the ALJ was required to account for them in the residual functional capacity assessment or at least explain why she was rejecting them.

I find no error in the ALJ's consideration of Donahoo's opinion.  As the ALJ observed, Donahoo's opinion that plaintiff would have "some difficulty" with certain tasks was "somewhat vague."  AR 25.  However, the ALJ understood Donahoo to have concluded that, in spite of having "some difficulty" in certain areas, plaintiff was capable of "performing simple work activity in a routine work setting, with some difficulty interacting with others." AR 25.  This was a reasonable interpretation of Donahoo's assessment.  Notably, after each statement in which she noted the areas in which plaintiff would have "some difficulty," Donahoo stated plaintiff's abilities in positive terms.  For example, after noting that plaintiff would have "some difficulty" following a schedule, working around others and handling a normal workweek, Donahoo added:  "He shows the capacity to carry out simple to complex instructions in a routine work setting on a regular basis." AR 74.  Similarly, after noting that plaintiff would have "some difficulty" interacting with others in the workplace, Donahoo wrote:  "He shows the capacity to respond to others in a routine work setting."  Id.  Finally, after noting that plaintiff would have "some difficulty" adapting to change and stress, Donahoo wrote:  "He shows the capacity to respond appropriately to changes in a routine

13

work setting." Id.

The ALJ incorporated these findings into her residual functional capacity assessment, limiting plaintiff to work that was simple, routine, and repetitive.  In addition, she accounted for plaintiff's difficulties with stress and change by precluding work at a "production rate pace" and adding a requirement that there be few workplace changes.  Finally, she found that plaintiff could tolerate only occasional (up to one-third of the workday) interaction with supervisors, co-workers, and the public.  I am satisfied that these limitations adequately account for the entirety of Donahoo's opinions and that the ALJ did not improperly "cherry pick."  Moreover, plaintiff does not suggest how a vocational expert could reasonably form an opinion about the kinds of jobs a person could do based on a vague, unquantified statement that he or she would have "some difficulty" with a particular task.  In sum, the ALJ did not err in her handling of Donahoo's opinion.


B. Dr. Yim's Opinion

Plaintiff argues that the ALJ erred in finding Dr. Yim's May 2020 opinion unpersuasive.  On the Mental Work Capacity Questionnaire, Dr. Yim indicated, among other things, that plaintiff was incapable of even low stress jobs, could not maintain attention, concentration or regular attendance for more than 15 percent of the workday, and could not interact appropriately with the general public or supervisors for more than 15 percent of the workday.  As noted earlier, the ALJ found such "extreme limitations" inconsistent with the doctor's own treatment records, which the ALJ found showed

14

"generally unremarkable objective findings on mental status examinations." AR 26. The ALJ also found Yim's opinion inconsistent with plaintiff's testimony that his symptoms are generally controlled with regular use of his medications.

Plaintiff first argues that the ALJ, as a layperson, was not qualified to determine whether plaintiff's largely normal mental status evaluations "evidenced an improvement in Leisgang's condition." Br. in Supp., dkt. #13, at 25. However, the ALJ did not specifically find that the mental status evaluations "showed improvement," but rather that they failed to support and were inconsistent with the extreme functional limitations Dr. Yim had endorsed. Comparing Dr. Yim's opinion to her treatment notes was proper. Prill v. Kijakazi, 23 F. 4th 738, 750 (7th Cir. 2022) (upholding ALJ who emphasized medical reports showing that plaintiff had normal reflexes, full strength, normal knees, and normal gait over other reports showing range-of-motion loss and diminished sensation); Gibbons v. Saul, 801 F. App'x 411, 416 (7th Cir. 2020) ("an ALJ is not required to accept opinions contradicted by other medical evidence"); Hinds v. Saul, 799 F. App'x 396, 399 (7th Cir. 2020) (proper for ALJ to discount treating physician's opinion that claimant suffered from constant lower lumbar pain where months earlier physician noted that claimant had normal gait and range of motion and no muscle or joint pain). Further, an ALJ is entitled to draw common-sense conclusions from medical records where they are written in "plain English" and not beyond ability of a lay person to understand. Callaway v. Saul, No. 19-CV-818-JDP, 2020 WL 2214385, at *2 (W.D. Wis. May 7, 2020). Here, the ALJ did not err in finding that Dr. Yim's treatment notes, which were written in plain English and

which repeatedly documented plaintiff's normal appearance, speech, thought content, thought process, and stable mood, and which described him as "cooperative and pleasant," were inconsistent with her opinion that plaintiff had extreme limitations in numerous work-related functions, including his ability to make simple work-related decisions, work around others, or maintain attention and concentration.

Plaintiff's remaining criticisms of the ALJ's assessment of Dr. Yim's opinion are equally unpersuasive. Plaintiff contends that normal mental status exams in the clinical setting say little about how he would function in the workplace. Maybe so, but I cannot conclude that the ALJ was required to discount the mental status findings for this reason. See Freeman United Coal Mining Co. v. Benefits Review Bd., United States Dep't of Labor, 909 F.2d 193, 195 (7th Cir. 1990) ("It is for the ALJ to weigh conflicting evidence and draw inferences from it; a reviewing court may not draw contrary inferences merely because they appear more reasonable[.]"); see also Stepp v. Colvin, 795 F.3d 711, 718 (7th Cir. 2015) ("We uphold all but the most patently erroneous reasons for discounting a treating physician's assessment.") (internal quote marks omitted). Plaintiff also accuses the ALJ of "cherry-picking," arguing that the ALJ failed to mention certain excerpts from Dr. Yim's notes in which plaintiff reported a worsening of his symptoms. Br. in Supp., dkt. # 13, at 20. Contrary to plaintiff's argument, the ALJ did discuss these instances in her decision, pointing out that the exacerbations were typically short-lived and situational and responded well to medication adjustments. Indeed, plaintiff acknowledged at the hearing that his medications were "doing a pretty good job" keeping him "fair[l]y balance[d]." AR 46.

Overall, the record supports the ALJ's conclusion that the extreme limitations endorsed by Dr. Yim were not supported by plaintiff's more recent medical records, including Dr. Yim's own notes, which generally showed that plaintiff's mental conditions were not causing significant difficulties and were responding well to therapy and medication. Because this conclusion is reasonably supported by the evidence, I must defer to it.

Finally, plaintiff asserts that the ALJ's discussion of Dr. Yim's opinion was too cursory. In plaintiff's view, the commissioner's updated rules for evaluating medical evidence demand a "greater level of articulation" by ALJs than was required by the old rule. I disagree. The current regulation provides that ALJs must "explain how we considered the supportability and consistency factors" for a medical source's medical opinions and "*may, but are not required to*" explain how other relevant factors such as relationship with the claimant and length of the treatment relationship were weighed. <u>See</u> 20 C.F.R. § 404.1520c(b)(emphasis added). As I noted in a recent opinion, "[t]he regulation says nothing about how detailed the ALJ's discussion must be, much less suggest that it must resemble a 'comparison and contrast term paper,' as plaintiff argues in his brief." <u>Steele v. Kijakazi</u>, No. 20-CV-987-BBC, 2021 WL 5881454, at *4 (W.D. Wis. Dec. 13, 2021). If anything, the new regulation requires a *lower* level of articulation than the Seventh Circuit required under the old rule. <u>See</u>, <u>e.g.</u>, <u>Scrogham v. Colvin</u>, 765 F.3d 685, 697–98 (7th Cir. 2014) (criticizing ALJ for failing to discuss factors relevant to weighing medical opinions under former rule, including length of plaintiff's relationship with his physicians, the nature of the treatment for his progressive disease, the consistency of the doctors' reports, and

physician's specialty).  The ALJ's discussion of Dr. Yim's opinion meets the demands of the new regulation and her conclusions have substantial evidentiary support in the record. Accordingly, remand is not warranted.

### C.  Challenge to Vocational Expert Testimony

At step five of the sequential evaluation, it becomes the Commissioner's burden to demonstrate with substantial evidence that the plaintiff can make a vocational adjustment to work existing in the national economy, and that those jobs exist in significant numbers. Chavez v. Berryhill, 895 F.3d 962, 964 (7th Cir. 2018).  To carry this burden, the ALJ must ensure that the vocational expert's job-number estimates are "the product of a reliable method."  Id. at 968 (citing Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002)). "Before accepting a VE's job number estimate, the ALJ, when confronted by a claimant's challenge, must require the VE to offer a reasoned and principled explanation."  Id. at 970. "This is not a formalistic exercise but a pragmatic requirement designed to ensure the reliability of the job numbers; the ALJ is not required to extensively question a VE if there are 'sufficient indicia of reliability' as to the VE's testimony to support a conclusion about the applicant's ability to work."  Desotelle v. Kijakazi, No. 20-CV-1283, 2022 WL 409184, at *5 (E.D. Wis. Feb. 10, 2022) (quoting Biestek, 139 S. Ct. at 1157).

Plaintiff argues that the method used by the VE, Gilkerson, to arrive at his job-numbers estimates lacks foundation under Chavez and thus the ALJ erred in relying on it at step five.  A threshold question, however, is whether plaintiff waived the issue by failing to

object and develop an argument about the VE's estimates at the hearing before the ALJ. Before the hearing, plaintiff's counsel submitted a brief at the administrative level in which he made only a non-specific objection to the VE's expected job-numbers testimony.  AR 351. At the hearing, he asked Gilkerson these questions:

Q:  Okay.  What sources do you utilize in order to estimate your job numbers?

A:  These are Occupational Employment Quarterly, First Quarter 2020 data.

Q:  Okay. . . What methodology does the Occupational Employment Quarterly utilize in order to estimate job numbers?

A:  It utilizes the equal distribution method over the 840 SSC jobs, categories.

Q:  The Bureau of Labor Statistics gathers the data by sending out classification codes, correct?

A:  That's correct.

Q:  Does the OEQ . . . break that down by Dictionary of Occupational Titles code or is that just something that you do based upon the number of codes, DOT codes that are within the particular SOC code?

A:  They do it.

Q:  Do you believe that to be a reliable method of estimating job numbers in the national economy?

A:  It's the only method I have available to myself.

AR 61.  After this explanation, which merely established that Gilkerson had relied on the OEQ, counsel did not make any objection.  The ALJ did not address the reliability of Gilkerson's testimony in the decision, presumably because no objection was made.

Plaintiff contends that counsel's questions at the hearing were sufficient to "challenge" the reliability of the VE's testimony and trigger the ALJ's duty under Chavez to

19

further question him about the reliability of his job numbers before accepting the testimony. In plaintiff's view, he needed only to inquire "about the numbers and the method" used by the VE in order to provoke further inquiry by the ALJ.  This argument, however, has already been made and rejected by this court and the Seventh Circuit.  Coyier v. Saul, No. 19-CV-393-BBC, 2020 WL 9812040, at *3 (W.D. Wis. Apr. 2, 2020), aff'd, 860 F. App'x 426 (7th Cir. 2021).  In Coyier, the plaintiff's counsel asked the vocational expert about the source of his job numbers.  When the VE stated that he relied on Occupational Employment Quarterly, plaintiff's counsel stated that he objected to that "method." Id. at *3.  However, Coyier's counsel did not explain specifically why he objected to the method as applied in the case, beyond referring to Chavez.  Id.  As plaintiff does in this case, Coyier argued that "under Chavez, it was the administrative law judge's burden to ask questions about the vocational expert's methodology once counsel raised an objection." Id.  This court disagreed, concluding that:

> [P]laintiff reads Chavez too broadly. In that case, there were obvious problems with the vocational expert's numbers, so the administrative law judge was on notice that he needed to question the vocational expert about his methodology. In this instance, plaintiff raised only a blanket objection to the vocational expert's reliance on Occupational Employment Quarterly. Plaintiff did not identify any specific issues that the administrative law judge should explore with the vocational expert. In addition, the administrative law judge gave plaintiff the opportunity to submit supplemental briefing after the hearing, but plaintiff did not do so.

Id.

The Seventh Circuit affirmed.  Addressing the same argument plaintiff raises in this case, the court stated:

On appeal Coyier argues that at step five a claimant needs to object only to some aspect of the expert's method used to arrive at his job-number estimate to trigger the ALJ's duty to ensure the reliability of the VE's methodology. She claims that the ALJ erred by not scrutinizing the VE's methodology. However, Coyier waived any challenge to the VE's testimony by failing to ask any questions to reveal shortcomings in the job-number estimates or to submit a supplemental brief on the issue despite assuring the court prior to and at the hearing that he would do so. These omissions effectively conceded the reliability of the VE's job numbers.

Coyier, 860 F. App'x at 427–28. The court found that "Counsel's failure to avail himself of the opportunity to develop an argument about the expert's estimates is a waiver." Id. at 426.

Here, the ALJ did not offer counsel the opportunity to submit supplemental briefing after the hearing, but counsel never asked for one.  Indeed, although counsel's questions *suggested* that he was challenging the reliability of Gilkerson's job numbers, he never made any specific objection or asked the ALJ to disregard the numbers for lack of reliability.  All counsel did was establish that Gilkerson had relied on the OEQ and confirmed that the OEQ relied on the equal distribution method.  As the Seventh Circuit made clear in Coyier, however, "Chavez did not enjoin the use of the equal-distribution method and created no new obligations at step five . . . the ALJ was entitled to accept an expert's testimony that was uncontradicted and otherwise proper[.]"  Coyier, 860 F. App'x at 428 (internal quotations and citations omitted).  See also Surprise v. Saul, 968 F.3d 658, 662 (7th Cir. 2020) (explaining that an ALJ may properly accept a VE's uncontradicted testimony absent obvious internal conflicts).

Although plaintiff *purports* to recognize that the "use of the OEQ" is not "automatically unreliable," Br. in Supp., dkt. #13, at 38, his argument implies just that.  As

21

just explained, that is not the law in this circuit.  Having failed to identify any specific shortcomings in the VE's job-numbers estimates at the hearing, plaintiff cannot contest the reliability of those numbers now.

In a footnote, plaintiff suggests that the Supreme Court held in Carr v. Saul, 141 S. Ct. 1352 (2021), that social security disability claimants need not raise an issue before the ALJ to preserve it on appeal.  Id. at 30 n.2.  However, plaintiff forfeited this argument by relegating it to a footnote and failing to develop it properly in the main body of his brief. Estate of Moreland v. Dieter, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived."); Hammer v. Residential Credit Sols., Inc., No. 13 C 6397, 2015 WL 7776807, at *4 (N.D. Ill. Dec. 3, 2015) (defendant "waived any timeliness argument by making only a token effort to address it in its Rule 50(b) brief, relegating the argument to a two-sentence footnote").  Even if not forfeited, the argument fails on its merits, for two reasons.  First, the Seventh Circuit decided Coyier after the Supreme Court decided Carr; presumably, the Seventh Circuit was aware of the Court's decision.  Second, the Court made clear in Carr that it was considering whether to impose an issue-exhaustion requirement only "[i]n the specific context of petitioners' Appointments Clause challenges," 141 S. Ct. at 1360, and was *not* considering "the sphere of routine objections to individual benefits determinations" like the one plaintiff raises here.   Id. at 1360 n.5 (emphasis added); see also Desotelle, 2022 WL 409184, at *6–7 (rejecting same argument, finding that the plaintiff "reads Carr much, much too broadly.").  As such, Carr did not dispense with plaintiff's obligation to challenge the VE's job-numbers testimony with something more than

reliance on the OEQ.  Accordingly, his step five challenge must be denied.


ORDER

IT IS ORDERED that the Acting Commissioner's decision denying plaintiff Michael
Leisgang's applications for disability insurance benefits and supplemental security income
is AFFIRMED.  The clerk of court is directed to enter judgment for defendant and close this
case.

Entered this 31st day of March, 2022.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge